UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GEARY MYERS, | : | |
| Plaintiff | : | CIVIL ACTION NO. 3:22-402 |
| v. | : | (JUDGE MANNION) |
| GEORGE M. LITTLE, *et al.*, | : | |
| Defendants | : | |

### MEMORANDUM

Currently before the Court is *pro se* Plaintiff Geary Myers ("Myers")'s motion for reconsideration of this Court's Memorandum and Order granting Defendants' motion for judgment on the pleadings. For the reasons stated below, the Court will grant the motion, vacate the Memorandum and Order granting Defendants' motion for judgment on the pleadings as improvidently granted at the 12(b)(6) stage of the proceeding, direct the Clerk of Court to reopen the case, deny Defendants' motion for judgment on the pleadings, and set a new schedule for discovery and the filing of dispositive motions.

### I. BACKGROUND

On September 22, 2022, Myers filed a second amended complaint in which he asserted First Amendment retaliation claims under 42 U.S.C. §1983 against Defendants Jason Bohinski ("Bohinski"), Kevin Monko ("Monko"), and Brady Belles ("Belles"). (Doc. 22.) Myers alleged that despite

being incarcerated in Commonwealth of Pennsylvania Department of Corrections ("DOC")'s facilities for the past twenty-seven (27) years, he "has not once been institutionally charged with fighting, assualt [sic] or anything related to violence." (*Id.* ¶¶4–5.) At some point during his incarceration, Myers was transferred to Pennsylvania State Correctional Institution Dallas ("SCI Dallas"), where Defendants were employed. (*Id.* ¶¶1–3, 8.) While at SCI Dallas, Myers "was on the active mental health roster." (*Id.*)

On June 17, 2021, Monko removed Myers from general population and placed him in administrative custody "for investigation purposes." (*Id.* ¶9.) A week later, on June 24, 2021, Myers complained to Bohinski that Monko was continually harassing him, and he requested that Bohinski reprimand Monko for this harassment. (*Id.* ¶10.) Then, on June 30, 2021, Myers appeared before Bohinski and Belles, and Bohinski stated to Belles that (1) they were returning Myers to general population, (2) Myers had complained that Belles's office was harassing him, and (3) they found no evidence that Myers had violated any facility rules. (*Id.* ¶11.) Myers then was released into general population. (*Id.* ¶12.)

Myers alleged that two (2) other events occurred on June 30, 2021. (*Id.* ¶¶13, 21.) First, Belles told Monko that Myers had complained about the security office. (*Id.* ¶13.) Second, Myers filed a request slip to Bohinski

informing him that he wanted to file a civil action against Monko and Belles "for their retaliation against him," and he requested that Bohinski protect him from their retaliation. (*Id.* ¶21.)

Myers avers that he remained in general population without incident until approximately July 6, 2021, when Monko removed him from general population and placed him in "Administrative Custody in solitary confinement." (*Id.* ¶14.) Monko also "<u>falsely</u> placed in Myers [sic] file that he attempted to assualt [sic] a Correctional Officer with a weapon" that day. (*Id.* ¶15.)

On or about the following day, July 7, 2021, Bohinski told Myers that Myers was under investigation. (*Id.* ¶22.) In response, Myers told "them [sic] that this matter was already resolved and deemed false." (*Id.*) Bohinski then explained to Myers that the investigation concerned a different matter in which they had information about someone wanting to harm him. (*Id.*) Bohinski also read Myers's file and, despite seeing "notations that Myers was being accused of threatening a [c]orrectional [o]fficer with a weapon, . . . he intentionally communicated falsely that the notations stated that it was Myers who was in danger." (*Id.* ¶23.)

On July 21, 2021, Myers complained to Bohinski that "the conditions that he was[]under was causing him to feel depressed and he wanted to

- 3 -

know what was going on with the investigation." (*Id.* ¶24.) Bohinski told Myers that he needed to be "patient," that he would be transferred, that they were holding him "to keep [him] safe," and that he would receive a "non-disciplinary transfer" in which he would "stay in the Eastern Region." (*Id.*)

Myers spoke to "Bohinski et al." on August 5, 2021, during which Myers requested to make a "legal call." (*Id.* ¶25.) Myers told Bohinski that "he would like to bring a Civil Action against your committee for holding [him] under these conditions without a cup, television[,] or radio [despite] knowing that [he] suffer[s] from mental health issues." (*Id.*)

On August 11, 2021, Myers "went before Bohinski, Belles et al." and informed Bohinski that "he was suffering due to inmates banging on their toilets all night and screaming on their doors depriving him of sleep." (*Id.* ¶26.) Myers then requested to make a "legal phone call" to ask his attorney to call the DOC's central office "to expedite [his] transfer to get [him] out of these cruel conditions." (*Id.* ¶16); *see also* (*id.* ¶26). Bohinski and Belles "confer[red]" about this request after which Bohinski directed Belles to place a report in Myers's transfer petition that he threatened to use a weapon on a correctional officer. (*Id.* ¶27.) Bohinski then "place[d] a false notation in Myers [sic] file that sanctioned [sic] that [Myers] did threaten an officer with a weapon." (*Id.* ¶28); *see also* (*id.* ¶17 ("Following this complaint, Belles filed

- 4 -

a <u>false</u> document stating that Myers was a danger to some person in the facility on August 11, 2021 and recommended a transfer.")).

According to Myers, the DOC's Office of Population Management used "Bohinski's false notation to categorize Myers'[s] transfer as a 'disciplinary' transfer and transferred him eight (8) hours away from his family" to Pennsylvania State Correctional Institution Greene ("SCI Greene"), located in the "western region of Pennsylvania," on September 23, 2021. (*Id.* ¶¶20, 29.) Although Bohinski had "<u>complete</u> authority to stop Myers [sic] transfer and or [sic] correct the false information used to transfer him," he failed to do so. (*Id.* ¶¶30, 31.) Myers also averred that "Bohinski is no-wayshape-or-form [sic] . . . a Hearing Examiner[,] . . . has no duties that permits [sic] him to operate as such[, and] . . . there is no DOC policy that grants him the title of Hearing Examiner." (*Id.* ¶32.)

Due to the "false actions and notations" of Monko and Belles, Myers spent more than ninety (90) days in solitary confinement. (*Id.* ¶18.) In addition, Monko and Belles's actions meant that Myers's "commutation request/petition is doomed, as this unjust disciplinary transfer place[d] him in a bad light." (*Id.* ¶19.) Overall, Myers claimed that Defendants' unlawful retaliatory conduct warranted him recovering nominal, compensatory, and punitive damages. (*Id.* at 5.) He also sought injunctive relief requiring

- 5 -

Defendants to (1) contact appropriate officials to remove the "false Notations [sic] in Myers [sic] file," (2) direct those officials to reclassify his transfer as an administrative transfer rather than a disciplinary transfer, and (3) recommend to officials that Myers be returned to his home region in the eastern part of Pennsylvania. (*Id.*)

Defendants filed an answer with affirmative defenses to Myers's second amended complaint on February 24, 2023. (Doc. 28.) The Court then entered an Order on June 22, 2023, which, *inter alia*, established a discovery deadline of August 24, 2023, and a dispositive motions deadline of September 25, 2023. (Doc. 34.) Prior to the expiration of the discovery deadline, Defendants filed a motion for judgment on the pleadings and a supporting brief on August 14, 2023, and August 25, 2023, respectively. (Docs. 38, 39.) Myers filed a brief in opposition to Defendants' motion on September 26, 2023. (Doc. 42.)

This Court issued a Memorandum and Order on March 25, 2024, granting Defendants' motion for judgment on the pleadings, entering judgment in their favor on Myers's First Amendment retaliation claims in his second amended complaint, and directing the Clerk of Court to close the case. (Docs. 45, 46.) The Court determined that even though Defendants conceded that Myers had engaged in protected conduct when he verbally

complained and submitted request slips, Myers did not sufficiently allege that he was subjected to any adverse action or allege a sufficient causal connection between his protected activity and the alleged adverse action. (Doc. 45 at 10–15.) In particular, the Court interpreted Myers's second amended complaint as alleging that the only adverse action he experienced was being placed in solitary confinement, which was insufficient to plausibly plead that an adverse action was taken against him. (*Id.* at 12–13.)

As for the lack of plausible allegations showing a causal connection, the Court explained that:

> While [Myers] does allege Defendants were aware of his complaints, he fails to allege any causal connection. Here, [Myers]'s own allegations reveal that [his] initial placement in administrative custody on June 17, 2021, was well before his June 24, 2021 complaint regarding Defendant Monko. (Doc. 22 at 2). Thus, [Myers]'s complaint fails to connect his initial placement to any protected activity.
>
> On June 30, 2021, [Myers] was released back into general population. (Doc. 22 at 4). On July 6, 2021, [Myers] was again placed in Administrative Custody, and on September 23, 2021, [Myers] was transferred to SCI- Greene. *Id.* Here, [Myers] fails to make any showing that Defendants engaged in a "pattern of antagonism," *see Mearin*[ *v. Greene*, 555 F. App'x 156, 158–59 (3d Cir. 2014) (unpublished)], nor is there corroborating evidence to support a suggestive temporal proximity, *see Shellenberger*[ *v. Summit Bancorp, Inc.,* 318 F.3d 183, 189 (3d Cir. 2003)]. [Myers]'s own exhibit demonstrates that [his] July 6, 2021 placement in Administrative Custody was based on information received that [he] was attempting to obtain a weapon to assault a staff member and that he was also planning to assault other inmates as well. (Doc. 22 at 8). To the extent that [Myers] alleges

> that "Bohinski did read [his] file and personally seen notations that [Myers] was being accused of threatening a Correctional Officer with a weapon, but he intentionally communicated falsely that the notations stated that it was [Myers] who was in danger," is of no moment, as both situations would require protective Administrative Custody confinement. [Myers] offers nothing to refute this. As such, [Myers] has failed to establish a causal connection between any complaint made by [him] and Defendants' actions in placing [him] in Administrative Custody for his own protection.

*Id.* at 14–15.

Following the entry of judgment in Defendants' favor, Myers filed the instant motion for reconsideration in which he sufficiently alleged adverse actions and causation in his second amended complaint, and he contends that the Court incorrectly characterized or omitted certain allegations in the second amended complaint in the Memorandum. (Docs. 47; 48 at 1–4.) Defendants oppose this motion, arguing that the Court correctly determined that Myers's allegations were insufficient to establish First Amendment retaliation claims against them and asserting that Myers is essentially attempting to relitigate the issues resolved in the Court's Memorandum and Order. (Doc. 51 at 1–5.)

## II.   LEGAL STANDARD

Because Myers is challenging the Memorandum and Order granting Defendants' motion for judgment on the pleadings and entering judgment in their favor, his motion for reconsideration is construed as one timely filed

- 8 -

under Federal Rule of Civil Procedure 59(e). *See* Fed. R. Civ. P. 59(e) ("A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."); Fed. R. Civ. P. 54(a) (defining "judgment" as "a decree and any order from which an appeal lies").[1] A district court may alter or amend a judgment under Rule 59(e) if "the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence [that was not previously available]; or (3) the need to correct a clear error of law or prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)).

These limited, permissible grounds for Rule 59(e) relief illustrate that "[t]he purpose of a motion for reconsideration is 'to correct manifest errors of law or fact or to present newly discovered evidence.'" *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (per curiam) (quoting *Max's Seafood Café*, 176 F.3d at 677). Its purpose is not to allow a disgruntled litigant to

---

[1] Local Rule 7.10 generally applies to motions for reconsideration filed in this District and provides that "[a]ny motion for reconsideration or reargument must be accompanied by a supporting brief and filed within fourteen (14) days after the entry of the order concerned." M.D. Pa. L.R. 7.10. However, "[t]his rule is not applicable to a motion to alter or amend a judgment under Fed. R. Civ. P. 59," *id.*, such as the instant motion.

> "request that the Court simply rethink a decision it has already made." *Douris v. Schweiker*, 229 F. Supp. 2d 391, 408 (E.D. Pa. 2002). In such a motion, "parties are not free to relitigate issues that the Court has already decided." *United States v. Jasin*, 292 F. Supp. 2d 670, 676 (E.D. Pa. 2003) (internal citation and quotations omitted). "The standard for granting a motion for reconsideration is a stringent one.... [A] mere disagreement with the court does not translate into a clear error of law." *Mpala v. Smith*, CIV. 3:CV–06–841, 2007 WL 136750, *2 (M.D. Pa. Jan. 16, 2007) (Kosik, J.)[,] *aff'd*, 241 F. App'x 3 (3d Cir. 2007). "Because federal courts have a strong interest in the finality of judgments, motions for reconsideration should be granted sparingly." *Cont'l Cas. Co. v. Diversified Indus., Inc.*, 884 F. Supp. 937, 943 (E.D. Pa. 1995).

*Chesapeake Appalachia, L.L.C. v. Scout Petroleum, LLC*, 73 F. Supp. 3d 488, 491 (M.D. Pa. 2014), *aff'd sub nom. Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746 (3d Cir. 2016).

### III. DISCUSSION

While the Court recognizes the limited grounds for granting reconsideration and the directive that such motions should be granted sparingly, the Court concludes that reconsideration is appropriate in this case. In the first instance, Myers accurately points out that the Court incorrectly stated that he did "not allege anything more than [his] solitary confinement placement" as the adverse action taken against him. (Docs. 48 at 2; 45 at 13.) After reviewing the second amended complaint again and liberally construing it in light of Myers' *pro se* status, Myers alleged not only that he was placed in solitary confinement/administrative custody for

complaining about Monko (and possibly Belles) but that while he was there he did not have a "cup, television[,] or radio," and was subjected to other "inmates banging on their toilets all night and screaming on their doors depriving him of sleep." (Doc. 22 ¶¶14, 25, 26.) He also alleged that he remained in administrative custody for more than ninety (90) days and was transferred to SCI Greene, which was located far away from his family. (*Id.* ¶¶18, 20, 29.) These allegations are sufficient at the motion to dismiss stage to show Myers suffered an adverse action at the hands of Defendants.

To plausibly plead adverse action, Myers had to allege that the retaliatory conduct "would . . . deter a prisoner of ordinary firmness from exercising his or her First Amendment rights." *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000). Concerning the issue of whether a prisoner's placement in administrative custody/segregation can constitute adverse action for purposes of a First Amendment retaliation claim, the Third Circuit Court of Appeals has explained that:

> Although it is possible that in some cases placement in administrative segregation would not deter a prisoner of ordinary firmness from exercising his or her First Amendment rights, we cannot say that such action can never amount to adverse action. On the contrary, whether a prisoner-plaintiff has met that prong of his or her retaliation claim will depend on the facts of the particular case.

*Id.* Thus, allegations that a prisoner-plaintiff was placed in administrative segregation, which "resulted, *inter alia*, in reduced access to phone calls, reduced access to the commissary, reduced access to recreation, confinement in [their] cell for all but five hours per week, denial of access to rehabilitative programs and, significantly, inadequate access to legal research materials and assistance," were sufficient to plead an adverse action. *Id.*; *see also Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) (unpublished) ("In the prison context, we have held that the following actions were sufficient to establish adversity: several months in disciplinary confinement; denial of parole, financial penalties, and transfer to an institution whose distance made regular family visits impossible; and placement in administrative segregation that severely limited access to the commissary, library, recreation, and rehabilitative programs." (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003), *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001), and *Allah*, 229 F.3d at 225–26)).

Here, Myers alleges that due to Defendants' retaliation against him, he remained in solitary confinement for more than 90 days and was transferred to SCI Greene, which is located far away from his family. *See* (Doc. 22 ¶¶18, 20, 29). These allegations, taken as true are sufficient to show Myers suffered an adverse action at this stage. *See Mitchell*, 318 F.3d at 530

(concluding that "several months in disciplinary confinement would deter a reasonably firm prisoner from exercising [their] First Amendment rights"); *Rauser*, 241 F.3d at 333 (determining that plaintiff's evidence showing that "he was denied parole, transferred to a distant prison where his family could not visit him regularly, and penalized financially," was "sufficient evidence of adversity to survive summary judgment").

Myers also alleges that Monko and Bohinski placed "false notation[s]" in Myers's file, and that Belles filed a "<u>false</u> document." (Doc. 22 ¶¶15, 17, 27–28.) More specifically, Myers alleges that Monko placed a "false notation" that Myers had attempted to assault a correctional officer with a weapon in Myers's file on or about July 6, 2021. (*Id.* ¶15.) Myers then alleges that, on August 11, 2021, Bohinski directed Belles to "provide Myers with another report and place in Myers'[s] transfer petition that [he] threatened to use a weapon on a correctional officer[]." (*Id.* ¶27.) Belles then filed a "<u>false</u> document stating that Myers was a danger to some person in the facility," and Bohinski "placed a false notation in Myers [sic] file that he did threaten an officer with a weapon." (*Id.* ¶¶17, 28.)

It is admittedly unclear from Myers's allegations what he is referring to when he identifies a "false notation," false report, or "<u>false</u> document" in his second amended complaint. Nevertheless, after considering the severity of

the act(s) Myers allegedly committed as identified in the false notations, document, and report, *i.e.* threatening to use a weapon on a correctional officer, as well as liberally construing the second amended complaint, it appears that Myers is alleging that at least one (1) false misconduct was issued against him. This construction is supported by Myers specifically challenging whether Bohinski could act as a Hearing Examiner, since a hearing examiner would decide whether to uphold a misconduct charge. *See, e.g.*, *Medina v. Savage*, No. 23-cv-886, 2024 WL 3967487, at *2 (E.D. Pa. Aug. 27, 2024) (describing DOC's discipline system for incarcerated persons and explaining that "[a] Hearing Examiner hears and resolves [a] misconduct charge" (footnote and citation omitted)). Presuming that Myers is referencing a false charge of written misconduct when he complains about "false notation[s]," false reports, or a "<u>false</u> document," he has again identified adverse actions because a prisoner-plaintiff's "allegation that [they] were] falsely charged with misconduct in retaliation [for engaging in protected activity] implicates conduct protected by the First Amendment." *Mitchell*, 318 F.3d at 530 (citations omitted).

The final pertinent allegation concerning adverse action in the second amended complaint is Myers's allegation that he was denied a "cup, television[,] or radio" while in administrative custody. (Doc. 22 ¶25.)

Defendants argue that this allegation is insufficient to show adverse action. (Doc. 51 at 3 (citing *Snider v. Alvarez*, No. 18-801, 2020 WL 6395499, at *18 (M.D. Pa. Nov. 2, 2020)). However, there have been conflicting decisions in this District as to whether a prisoner's loss of television service constitutes an adverse action. *Compare Snider*, 2020 WL6395499, at *18 (concluding that turning off plaintiff's cable for two (2) weeks was insufficient to "rise to the level of adverse action found by [the Third Circuit]"), *with Smith v. Shady*, No. 3:05-cv-2663, 2006 WL 314514, at *2 (M.D. Pa. Feb. 9, 2006) (determining that "[a]t this early juncture of the case and liberally construing the *pro se* Plaintiff's complaint, we find that he has alleged that he suffered an adverse action at the hands of prison officials" where plaintiff alleged that defendants retaliated against him by cutting off his cable television service). Regardless, these conflicting decisions are irrelevant here because Myers is not describing events where prison officials simply turned off the cable television feed to his cell. Instead, he is describing the conditions of his confinement in administrative custody, which, as already explained, can, in conjunction with the placement in administrative segregation itself, rise to the level of an adverse action. Therefore, when Myers's allegation about the lack of television, radio, and a cup while in administrative custody, is viewed in conjunction with his placement in administrative custody at this stage of the

proceedings, he has sufficiently alleged adverse action for purposes of his First Amendment retaliation claims.

As for causation, after reviewing the second amended complaint again in light of Myers's arguments in his brief in support of his motion for reconsideration, the Court finds that he has also sufficiently alleged a causal link between the exercise of his constitutional rights and at least some of the adverse actions taken against him. In this regard, the Court focuses on Myers's allegations relating to events starting on or about June 30, 2021, because Myers has not sufficiently alleged that his placement in administrative custody on June 17, 2021, which occurred before his first complaint about Monko on June 24, 2021, was related to any protected activity.

To summarize, Myers alleges that on June 30, 2021, Belles heard about Myers's complaint about the security office (which presumably included Monko) and told Monko about it later that day. (Doc. 22 ¶¶11, 13.) Monko then allegedly created a fictitious misconduct charge which resulted in Myers being placed in administrative custody on or about July 6, 2021. (*Id.* ¶¶14–15.) These allegations are sufficient to allege causation for Myers's First Amendment retaliation claim, at least against Monko.

For there to be a causal connection between his protected activity and the action that allegedly constituted retaliation, Myers must show either a suggestive temporal proximity between the protected activity and the allegedly retaliatory action or a pattern of antagonism coupled with timing to establish a causal link. *See Mearin*, 555 F. App'x at 158–59 (citing *Lauren W. ex. rel. Jean W. v. Deflaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). The Third Circuit has explained that, in the Title VII retaliation context, "'[a]lthough there is no bright line rule as to what constitutes unduly suggestive temporal proximity,' seven (7) days was "in the realm of what this Court and others have found sufficient . . . ." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007)); *see also Azzaro v. Cnty. of Allegheny*, 110 F.3d 968, 981 (3d Cir. 1997) ("The causation required to establish a [First Amendment retaliation] claim under §1983 is identical to that required under Title VII.").

Here, Myers alleges that Monko falsified a misconduct charge against him and placed him in administrative custody approximately six (6) days after Monko learned from Belles that Myers was complaining about the security office. (Doc. 22 ¶¶11, 13–15.) The timing between Monko learning about Myers's complaint and Myers receiving an allegedly false misconduct charge

and being placed in administrative custody could be sufficient to show a suggestive temporal proximity between Myers's protected activity—his complaint about the security office—and the allegedly retaliatory action. Similarly, Myers alleges that after asking to make a "legal phone call" and complaining about his conditions of confinement in administrative custody to Bohinski (and presumably Belles) on August 11, 2021, Bohinski placed a "false notation" in his file indicating that Myers had threatened an officer with a weapon and Belles filed a document falsely indicating that Myers was a danger to someone at SCI Dallas. (Doc. 22 ¶¶17, 26–28.) In addition, Bohinski's "false notation" allegedly caused Myers's transfer to SCI Greene to be characterized by the DOC as a disciplinary transfer. (*Id.* ¶29.) Since the alleged "false notation" and "<u>false</u> report" were placed in Myers's file on the same date he complained about the conditions of his confinement and requested to make a "legal phone call," Myers has sufficiently alleged causation for his First Amendment claims.

The adverse action with the most significant issue relating to its temporal proximity is Myers's transfer to SCI Greene on September 23, 2021, which was well over a month after the closest date mentioned in the second amended complaint where possible retaliation occurred, *i.e.* August 11, 2021. The passage of over a month would not be a suggestive temporal

proximity between the protected activity and the allegedly retaliatory action and considering that Myers does not allege any events occurring after August 11, 2021, he has not pleaded a pattern of antagonism to establish causation. However, although Myers's actual transfer did not occur until September 23, 2021, he alleged that Bohinski placed his "false notation" about Myers threatening another corrections officer in Myers's transfer petition. (*Id.* ¶¶27, 28.) Therefore, the machinations to have Myers transferred as a disciplinary transfer may have been put into place on August 11, 2021, even though he was not ultimately transferred until September 23, 2021. At this point, it would be premature for the Court to dismiss only this portion of Myers's claims until he has a chance to conduct discovery to establish a temporal link between his protected conduct and his transfer to SCI Greene and to otherwise develop a record in support of his claims in this case.

## IV. CONCLUSION

For the reasons stated above, the Court will grant Myers's motion for reconsideration, vacate the Court's March 25, 2024 Memorandum and Order granting Defendants' motion for judgment on the pleadings, direct the Clerk of Court to reopen the case, deny Defendants' motion for judgment on the

pleadings, and establish deadlines for discovery and the filing of dispositive motions. An appropriate Order follows.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: March 7, 2025**
22-402-02