**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GEARY MYERS,** | **:** | |
| **Plaintiff** | **:** | **CIVIL ACTION NO. 3:22-402** |
| **v.** | **:** | **(JUDGE MANNION)** |
| **GEORGE M. LITTLE, *et al.*,** | **:** | |
| **Defendants** | **:** | |

**MEMORANDUM**

Currently before the Court are the parties' cross-motions for summary judgment. For the reasons stated below, the Court will deny Plaintiff's motion for summary judgment and grant Defendants' motion for summary judgment.

## I. BACKGROUND

On September 29, 2022, *pro se* Plaintiff Geary Myers ("Myers"), a convicted and sentenced state prisoner, filed a second amended complaint in which he asserts First Amendment retaliation claims under 42 U.S.C. §1983 against Defendants Jason Bohinski ("Bohinski"), Kevin Monko ("Monko"), and Brady Belles ("Belles"). (Doc. 22.) Myers alleges that despite being incarcerated in Commonwealth of Pennsylvania Department of Corrections ("DOC")'s facilities for the past twenty-seven years, he "has not once been institutionally charged with fighting, assualt [sic] or anything related to violence." (*Id.* ¶¶4–5.) At some point during his incarceration,

Myers was transferred to Pennsylvania State Correctional Institution Dallas ("SCI Dallas"), where Defendants were employed. *See* (*id.* ¶¶1–3, 8). While at SCI Dallas, Myers "was on the active mental health roster." (*Id.*)

Myers alleges that on June 17, 2021, Monko removed him from general population and placed him in administrative custody ("AC") "for investigation purposes." (*Id.* ¶9.) A week later, on June 24, 2021, Myers complained to Bohinski that Monko was continually harassing him, and he requested that Bohinski reprimand Monko for this harassment. *See* (*id.* ¶10). On June 30, 2021, Myers appeared before Bohinski and Belles, and Bohinski stated to Belles that (1) they were returning Myers to general population, (2) Myers had complained that Belles's office was harassing him, and (3) they found no evidence that Myers had violated any facility rules. *See* (*id.* ¶11). Myers then was released into general population. *See* (*id.* ¶12).

Myers alleges that two other events occurred on June 30, 2021. *See* (*id.* ¶¶13, 21). First, Belles told Monko that Myers had complained about the security office. *See* (*id.* ¶13). Second, Myers filed a request slip to Bohinski informing him that he wanted to file a civil action against Monko and Belles "for their retaliation against him," and he requested that Bohinski protect him from their retaliation. (*Id.* ¶21.)

Myers avers that he remained in general population without incident until approximately July 6, 2021, when Monko removed him from general population and placed him in AC "solitary confinement." (*Id.* ¶14.) Monko also "falsely placed in Myers [sic] file that he attempted to assualt [sic] a Correctional Officer with a weapon" that day. (*Id.* ¶15.)

On or about the following day, July 7, 2021, Bohinski told Myers that he was under investigation. *See* (*id.* ¶22). In response, Myers told "them [sic] that this matter was already resolved and deemed false." (*Id.*) Bohinski then explained to Myers that the investigation concerned a different matter in which they had information about someone wanting to harm him. *See* (*id.*). Bohinski also reviewed Myers's file and, despite seeing "notations that Myers was being accused of threatening a [c]orrectional [o]fficer with a weapon, . . . he intentionally communicated falsely that the notations stated that it was Myers who was in danger." (*Id.* ¶23.)

On July 21, 2021, Myers complained to Bohinski that "the conditions that he was[]under was [sic] causing him to feel depressed[,] and he wanted to know what was going on with the investigation." (*Id.* ¶24.) Bohinski told Myers that he needed to be "patient," that he would be transferred, that they were holding him "to keep [him] safe," and that he would receive a "non-disciplinary transfer" in which he would "stay in the Eastern Region." (*Id.*)

Myers spoke to "Bohinski et al." on August 5, 2021, and he requested to make a "legal call." (*Id.* ¶25.) Myers told Bohinski that "he would like to bring a [c]ivil [a]ction against your committee for holding [him] under these conditions without a cup, television[,] or radio [despite] knowing that [he] suffer[s] from mental health issues." (*Id.*)

On August 11, 2021, Myers "went before Bohinski, Belles et al. [sic]" and informed Bohinski that "he was suffering due to inmates banging on their toilets all night and screaming on [sic] their doors depriving him of sleep." (*Id.* ¶26.) Myers requested to make a "legal phone call" to ask his attorney to call the DOC's central office "to expedite [his] transfer to get [him] out of these cruel conditions." (*Id.* ¶¶16, 26.). Bohinski and Belles "confer[red]" about this request, after which Bohinski directed Belles to place a report in Myers's transfer petition that he threatened to use a weapon on a correctional officer. (*Id.* ¶27.) Bohinski then "place[d] a false notation in Myers [sic] file that sanctioned [sic] that [Myers] did threaten an officer with a weapon." (*Id.* ¶28); *see also* (*id.* ¶17 ("Following this complaint, Belles filed a <u>false</u> document stating that Myers was a danger to some person in the facility on August 11, 2021 and recommended [sic] a transfer.")).

According to Myers, the DOC's Office of Population Management used "Bohinski's false notation to categorize Myers'[s] transfer as a 'disciplinary'

transfer and transferred him eight[](8) hours away from his family" to Pennsylvania State Correctional Institution Greene ("SCI Greene"), located in the "western region of Pennsylvania," on September 23, 2021. (*Id.* ¶¶20, 29.) Although Bohinski had "complete authority to stop Myers [sic] transfer and or [sic] correct the false information used to transfer him," he failed to do so. (*Id.* ¶¶30, 31.) Myers also avers that "Bohinski is no-wayshape-or-form [sic] . . . a Hearing Examiner[,] . . . has no duties that permits [sic] him to operate as such[, and] . . . there is no DOC policy that grants him the title of Hearing Examiner." (*Id.* ¶32.)

Due to the "false actions and notations" of Monko and Belles, Myers spent more than ninety days in solitary confinement. (*Id.* ¶18.) In addition, Monko and Belles's actions meant that Myers's "commutation request/petition [wa]s doomed, as this unjust disciplinary transfer place[d] him in a bad light." (*Id.* ¶19.) Overall, Myers claims that Defendants' unlawful retaliatory conduct warrants him recovering nominal, compensatory, and punitive damages. *See* (*id.* at 5). He also seeks injunctive relief requiring Defendants to (1) contact appropriate officials to remove the "false Notations [sic] in Myers [sic] file," (2) direct those officials to reclassify his transfer as an administrative transfer rather than a disciplinary transfer, and (3)

recommend to officials that Myers be returned to his home region in the eastern part of Pennsylvania. (*Id.*)

Defendants filed an answer with affirmative defenses to Myers's second amended complaint on February 24, 2023. (Doc. 28.) The Court then entered an Order on June 22, 2023, which, *inter alia*, established a discovery deadline of August 24, 2023, and a dispositive motions deadline of September 25, 2023. (Doc. 34.) Prior to the expiration of the discovery deadline, Defendants filed a motion for judgment on the pleadings and a supporting brief on August 14, 2023, and August 25, 2023, respectively. (Docs. 38, 39.) Myers filed a brief in opposition to Defendants' motion on September 26, 2023. (Doc. 42.)

This Court issued a Memorandum and Order on March 25, 2024, granting Defendants' motion for judgment on the pleadings, entering judgment in their favor on Myers's First Amendment retaliation claims in his second amended complaint, and directing the Clerk of Court to close the case. (Docs. 45, 46.) The Court determined that even though Defendants conceded that Myers had engaged in protected conduct when he verbally complained and submitted request slips, Myers did not sufficiently allege that he was subjected to any adverse action or that there was a causal

connection between his protected activity and the alleged adverse action. *See* (Doc. 45 at 10–15).

Following the entry of judgment in Defendants' favor, Myers filed a motion for reconsideration in which he challenged the Court's resolution of Defendants' motion, asserting that he sufficiently alleged adverse actions and causation in his second amended complaint, and contending that the Court incorrectly characterized or omitted certain allegations in the second amended complaint in the Memorandum. *See* (Docs. 47, 48). Defendants opposed this motion. (Doc. 51.)

On March 7, 2025, the Court issued a Memorandum and Order which, *inter alia*, granted Myers's motion for reconsideration, vacated the March 25, 2024 Memorandum and Order, denied Defendants' motion for judgment on the pleadings, and established new deadlines for discovery and dispositive motions. (Docs. 53, 54.) On May 16, 2025, Defendants filed their motion for summary judgment, statement of material facts, and supporting brief. (Docs. 57–59.) Myers also filed a motion for summary judgment and supporting brief, both of which the Clerk of Court docketed on May 19, 2025. (Docs. 60,

61.)[1] On the same date, Defendants filed a brief in opposition to Myers's motion. (Doc. 62.)

Myers filed an exhibit to his brief in support of his motion for summary judgment as well as a brief in opposition to Defendants' motion for summary judgment on June 2, 2025, and June 9, 2025, respectively. (Docs. 64, 65.) Defendants timely filed a reply brief in further support of their motion for summary judgment on July 17, 2025. (Docs. 66, 67, 70.) Then, on August 18, 2025, Myers filed a statement of material facts in support of his motion for summary judgment as well as a sur-reply brief. (Docs. 68, 69.) The parties' motions for summary judgment are ripe for disposition.

## II. LEGAL STANDARDS

### A. Motion for Summary Judgment Under Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Turner v. Schering-Plough Corp.*,

[1] The Clerk of Court docketed a duplicate copy of Myers's motion for summary judgment on May 27, 2025. (Doc. 63.)

901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party and is material if it will affect the outcome of the trial under governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F. Supp. 836, 838 (M.D. Pa. 1995).

At the summary judgment stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence . . . ."). Rather, the Court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *See Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323–24. The moving party can discharge that burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327

F.3d 229, 238 (3d Cir. 2003); *see also Celotex Corp.*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial, Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–23; *see also Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

The above standards do "not change when the issue is presented in the context of cross-motions for summary judgment." *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987). "When confronted with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. App'x 266, 270 (3d Cir. 2006) (unpublished) (citations omitted); *see also Auto-Owners Ins.*

*Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (explaining that when cross-motions for summary judgment are filed, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard"). "If review of cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving the judgment in light of the law and undisputed facts." *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 430 (M.D. Pa. 2006) (citing *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998)).

**B. Section 1983**

Section 1983 is the statutory vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. *See* 42 U.S.C. §1983. This statute states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution of laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

*Id.* "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v.*

*McCollan*, 443 U.S. 137, 144 n.3 (1979)). "To state a claim under §1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

### C. First Amendment Retaliation Claims

A plaintiff seeking to prove a First Amendment retaliation claim must satisfy three elements. First, the plaintiff must demonstrate that they engaged in constitutionally protected activity. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) ("As a threshold matter, a prisoner-plaintiff in a retaliation case must prove that the conduct which led to the alleged retaliation was constitutionally protected."). Second, the plaintiff must show that they "suffered some 'adverse action' at the hands of prison officials." *Id.* (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). The plaintiff meets this requirement if they prove that the defendant's action was "sufficient to deter a person of ordinary firmness from exercising [their First Amendment] rights." *Id.* (citing *Allah*, 229 F.3d at 225). Third, the plaintiff must prove "a causal link between the exercise of [their] constitutional rights and the adverse action taken against them" by showing that their "constitutionally protected conduct was 'a substantial or motivating factor' in

the decision to discipline [them].” *Id.* at 333–34 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see also Eskridge v. Phila. Hous. Auth.*, 722 F. App’x 296, 299 (3d Cir. 2018) (unpublished) (“To prove retaliation under . . . the First Amendment, a plaintiff must show that their protected activity was a but-for cause of the alleged adverse action . . . .” (citations and internal quotation marks omitted)).

As for causation, retaliation claims are “almost never subject to proof by direct evidence”; as such, the plaintiff must ordinarily “rely on circumstantial evidence to prove a retaliatory motive.” *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (citations omitted). The plaintiff “can satisfy [their] burden with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link.” *Id.* (footnote omitted). “In the absence of that proof the plaintiff must show that from the ‘evidence gleaned from the record as a whole’ the trier of the fact should infer causation.” *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)); *see also Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (pointing out that circumstantial evidence may include “inconsistent reasons given by the employer for terminating the

employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole").

If the plaintiff establishes a prima facie case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334; *see Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287 (concluding that upon a plaintiff establishing a prima facie case of retaliation, the burden shifts to the defendant to show "by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of protected conduct"). "This is often referred to as the 'same decision defense.'" *Watson*, 834 F.3d at 422. If the prison officials can make this showing, it defeats the plaintiff's retaliation claim. *See Rauser*, 241 F.3d at 334 ("[O]nce a prisoner has demonstrated that [their] exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.").

### D. Exhaustion of Administrative Remedies Under the Prison Litigation Reform Act ("PLRA")

The PLRA states in pertinent part that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). Stated differently, the exhaustion of available administrative remedies is a prerequisite for a prisoner asserting a claim under Section 1983 regarding their prison conditions. *See Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018) ("Exhaustion is . . . a non-jurisdictional prerequisite to an inmate bringing suit . . . ."); *see also Ross v. Blake*, 578 U.S. 632, 638 (2016) (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies" (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006))); *Jones v. Bock*, 549 U.S. 199, 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court" (citation omitted)); *Booth v. Churner*, 532 U.S. 731, 733–34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions" (quoting 42 U.S.C. §1997e(a))).

"The PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules.'" *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (alteration in original) (quoting *Woodford*, 548 U.S. at 88). "These applicable procedural rules are supplied by the individual prisons." *Id.* (citations omitted); *see also Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004) (stating that "the determination [of] whether a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"); *Jones*, 549 U.S. at 218 (explaining that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim"); *Woodford*, 548 U.S. at 90 (indicating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules").

A prisoner's failure to follow a prison's procedural rules will result in a procedural default of their claims. *See Spruill*, 372 F.3d at 230–32 (concluding that the PLRA's exhaustion requirement includes procedural default component); *see also Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010) (pointing out that *Spruill* held "that the PLRA includes a procedural default component and the determination whether a prisoner properly

exhausted a claim is made by evaluating compliance with the prison's specific grievance procedures"). A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to them. *See Rinaldi*, 904 F.3d at 266 ("The PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available.'" (quoting *Woodford*, 548 U.S. at 93)). "Available means capable of use; at hand." *Small v. Camden Cnty.*, 728 F.3d 265, 271 (3d Cir. 2013) (internal citations and quotation marks omitted). "An administrative remedy is unavailable when it 'operates as a simple dead end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Downey*, 968 F.3d at 305 (alterations in original) (quoting *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019)). "Although the availability of administrative remedies to a prisoner is a question of law, it necessarily involves a factual inquiry." *Small*, 728 F.3d at 271.

The failure to exhaust available administrative remedies "is an affirmative defense under the PLRA." *Jones*, 549 U.S. at 216. As such, "[t]he burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant." *Rinaldi*, 904 F.3d at 268 (citing *Ray v. Kertes*, 285 F.3d

287, 295 (3d Cir. 2002)). However, “once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to [them].” *Id.* (citation omitted).

Finally, requiring a prisoner to exhaust available administrative remedies before filing suit in federal court advances the policy justifications of the PLRA, *i.e.*, to “return[] control of the inmate grievance process to prison administrators, encourag[e] the development of an administrative record, and perhaps settlements, within the inmate grievance process, and reduc[e] the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits.” *Downey*, 968 F.3d at 305 (citation and internal quotation marks omitted); *Jones*, 549 U.S. at 204 (explaining that exhaustion requirement “allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court”). It also “reduces any incentive that prison officials otherwise might have to use threats to prevent inmates from exhausting their administrative remedies and thereby safeguards the benefits of the administrative review process for everyone.” *Rinaldi*, 904 F.3d at 268 (citation and internal quotation marks omitted).

## III. DISCUSSION

### A. Myers's Motion for Summary Judgment

Myers moves for summary judgment on his First Amendment retaliation claims against Defendants. He asserts that the Court should grant summary judgment in his favor because Defendants, *inter alia*: (1) "did not contest any factual allegations made in [his] filing against them" and "[o]nly attempt[ed] to have the suit dismissed after [he] sufficiently pled constitutional deprivations"; (2) "never explained [his prison transfer]" as he requested in his "Motion for Discovery"; and (3) had "several opportunities to remedy the[] constitutional deprivations through mediations" but refused to do so. *See* (Doc. 61 at 2). He also appears to primarily rely on the allegations in his second amended complaint as well as a July 14, 2022 response to an Inmate Request to Staff stating, "You did receive a negative transfer from SCI[]Dallas to Greene in 2021." (*Id.*; *see also* Doc. 64 at 2).[2]

Defendants oppose Myers's motion, pointing out that he did not file a separate statement of material facts as required by the Local Rules and inappropriately relies on his second amended complaint in support of his

[2] Myers's exhibit is unusual. Although it appears to be a DOC Form DC-135A Inmate's Request to Staff Member containing a signed response, the form itself does not include any request directed to a staff member. *See* (*id.*).

motion. *See* (Doc. 62 at 4–5). Defendants further contend that Myers fails to identify evidence establishing any of the elements for a retaliation claim, and, even if he did, they assert that summary judgment is improper because the evidence shows that they would have made the same decision to place him in AC and ultimately transfer him to a different prison regardless of Myers having engaged in protected activity. *See* (*id.* at 6–7).

After reviewing the parties' submissions, the Court will deny Myers's motion for summary judgment for at least three reasons. First, Myers's motion is procedurally deficient.

Local Rule 56.1 provides in pertinent part that "[a] motion for summary judgment . . . ***shall be accompanied*** by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. Pa. L.R. 56.1 (emphasis added). Local Rule 56.1's requirement that a party moving for summary judgment file a statement of undisputed material facts is consistent with Federal Rule of Civil Procedure 56, which requires the movant to show that there are no genuine issues of material fact for trial. *See Rocuba v. Mackrell*, No. 10-cv-1465, 2011 WL 6782955, at *4 (M.D. Pa. Dec. 21, 2011) ("The requirement of a statement of undisputed material facts as provided for in Local Rule 56.1 is consistent with Fed. R. Civ. P. 56[,] which

requires the movant to show that there are no genuine issues of material fact for trial."). In addition, this requirement serves a significant purpose because:

> [t]hese statements are not merely superfluous abstracts of the evidence. Rather, they are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions. They are, in short, roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own.

*Id.* (citation omitted).

Here, as Defendants point out, Myers did not comply with Local Rule 56.1 because he did not "accompan[y]" his motion for summary judgment with a statement of material facts. *See* M.D. Pa. L.R. 56.1; *see also* *Accompany*, Cambridge Dictionary Online, https://dictionary.cambridge.org/us/dictionary/english/accompany (last visited September 18, 2026) (defining "accompany" as, *inter alia*, "to be provided . . . at the same time as something"). This failure warrants denial of Myers's motion. *See, e.g.*, *Harrell v. Mayer*, No. 22-cv-730, 2025 WL 1970268, at *2 (M.D. Pa. July 16, 2025) (denying *pro se* plaintiff's motion for summary judgment due to their failure to comply with Local Rule 56.1); *Olivero-Leger v. Lamoreaux*, No. 20-cv-2288, 2023 WL 3234326, at *2 (M.D. Pa. May 3, 2023) (dismissing defendants' motion for summary judgment due to their failure to submit a statement of material facts in accordance with

Local Rule 56.1); *see also Gomez v. Cullen*, No. 21-2776, 2022 WL 1183713, at *3 (3d Cir. Apr. 21, 2022) (unpublished) (rejecting *pro se* appellant's argument that the district court abused its discretion by finding that appellant's statement of facts did not comply with Local Rule 56.1 and explaining that it "has noted in the past that it is within the district court's purview to mete out appropriate penalties when a party has not complied with a local rule" and "[t]he purpose of [Local Rule 56.1] is to promote judicial efficiency in the administration of summary judgment" (citing *Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613–14 (3d Cir. 2018))).

The Court recognizes that, approximately three months after filing his motion for summary judgment, Myers filed a statement of facts (Doc. 68) along with a "traverse" to defendants' reply brief they submitted in further support of their motion for summary judgment (Doc. 69). The Court mentions these submissions collectively because Myers references his belated statement of facts in the first portion of his "traverse," which is effectively a sur-reply brief insofar as Myers uses it to respond to Defendants' reply brief. *See* (Doc. 69 at 1–2).

Myers improperly filed his "traverse" insofar as he did not first obtain leave of this Court before filing it. *See* M.D. Pa. L.R. 7.7 ("A brief in reply to matters argued in a brief in opposition may be filed by the moving party within

fourteen (14) days after service of the brief in opposition. ***No further briefs may be filed without leave of court***." (emphasis added)); *see also Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (explaining that incarcerated *pro se* litigants may not "flout procedural rules"; rather, they "must abide by the same rules that apply to all other litigants"). As such, the Court need not consider it in resolving the pending motions. *See, e.g.*, *Catanzaro v. Aliexpress*, No. 22-cv-1768, 2026 WL 2018549, at *1 n.1 (M.D. Pa. July 13, 2026) (declining to consider *pro se* plaintiff's sur-reply filed without prior court approval). Nevertheless, even if the Court considered Myers's sur-reply brief to include a request for an extension of time to file his Local Rule 56.1 statement, the Court would deny it.

To obtain an extension of time after expiration of a deadline, Myers has the burden to show good cause and excusable neglect. *See* Fed. R. Civ. P. 6(b)(1) ("When an act may or must be done within a specified time, the court may, for good cause, extend the time: . . . (B) on motion made after the time has expired if the party failed to act because of excusable neglect."). As best the Court can discern, Myers attempts to satisfy his burden by arguing that (1) he lacked "access to the Local Rules," (2) he "should not be held to the same standard of a professional" because he is proceeding *pro se*, (3) he did not fail to file his Local Rule 56.1 statement "in a deliberate or malicious

manner," and (4) Defendants are not prejudiced by his failure to timely file his Local Rule 56.1 statement. *See* (Doc. 69 at 2).

None of Myers's apparent justifications show good cause for what is essentially a three-month extension of time or excusable neglect for his failure to timely file a Local Rule 56.1 statement. *See Joseph v. Hess Oil V.I. Corp.*, 651 F.3d 348, 351 (3d Cir. 2011) ("'Good cause' is understood to mean '[a] legally sufficient reason,' and it reflects 'the burden placed on a litigant (usu[ally] by court rule or order) to show why a request should be granted or an action excused.'" (first alteration in original) (quoting Black's Law Dictionary 251 (9th ed. 2009))); *Iseley v. Talaber*, No. 05-cv-444, 2008 WL 416885, at *3 (M.D. Pa. Feb. 13, 2008) (explaining that courts consider four factors when determining whether a party's neglect is excusable: "(1) the danger of prejudice; (2) the length and effect of the delay; (3) the reason for the delay; and (4) whether the movant acted in good faith." (citing *Pioneer Inv. Servs., Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993))). As for Myers's alleged lack of access to the relevant Local Rules, the Clerk of Court provided him with a copy of numerous Local Rules, including Local Rule 56.1, upon his commencement of this litigation. *See* (Doc. 2–3). Moreover, the Court is skeptical about the veracity of Myers's statement about lacking access to those Rules insofar as (1) he indicates that he

agrees with Defendants that Local Rule 56.1 requires summary judgment movants to submit a separate statement of material facts and then recites the language from the Rule, *see* (Doc. 69 at 1 ("The Plaintiff agrees with the Defendant's [sic] that Local Rule 56.1 states that a Motion for Summary Judgment . . . shall be accompanied by a seperate [sic], short and concise statement of material facts, in numbered paragraphs, as to which the moving party contends that there is no genuine issue to be tried."); and (2) he referenced Local Rule 7.10 when he filed his motion for reconsideration in April 2024, *see* (Doc. 47 at 1 ("Plaintiff . . . brings this motion pursuant to Local Rule 7.10 . . . .").

Even if Myers truly lacked access to the Local Rules as he asserts, his attempt to justify his belated filing falls flat for another reason, namely, his inability to justify the three-month delay in the filing of his Local Rule 56.1 statement. Myers appears to place the impetus on his belated filing on Defendants' contention in their reply brief in further support of their motion for summary judgment that he failed to file a response to their statement of facts. *See* (Doc. 69 at 1, ¶5 ("On July 17, 2025, the Defendant's filed a reply brief in [s]upport of their cross motion for [s]ummary [j]udgment claiming that they should be given the prayed for relief as the Plaintiff's filing failed to properly comport with the Rules of Court."). However, Defendants were not

discussing Myers's failure to file a statement of material facts in ***support*** of his motion for summary judgment in their reply brief. Instead, they were addressing Myers's failure to file a ***response*** to their statement of material facts as required by Local Rule 56.1. *See* (Doc. 67 at 1–2 (pointing out that Myers did not file a response to Defendants' statement of material facts and arguing that the Court should deem admitted the averments in their statement)). In addition, Myers ignores, or neglects to mention, that Defendants highlighted Myers's failure to file a statement of facts along with his motion for summary judgment in their brief in opposition to his motion for summary judgment, which they filed on the same date he filed his motion for summary judgment, and their filing occurred almost three months prior to Myers submitting his belated Local Rule 56.1 statement, *i.e.* May 19, 2025. *See* (Doc. 62 at 4 ("Not only has Plaintiff failed to point to any evidence, but he failed to include the required 'separate, short and concise statement of material facts. Local Rule 56.1.")).

In the end, Myers does not provide a good reason for this Court granting him a three-month extension of time to file his Local Rule 56.1 statement, especially considering all the submissions that have been filed in the interim. Additionally, even if the Court agreed with Myers that he did not deliberately or maliciously fail to timely file his Local Rule 56.1 statement and

presumed that Defendants are not prejudiced by the late filing (which is debatable), he has not met his burden to show excusable neglect because he has not provided a plausible reason for the delay, and the Court does not find that he has acted in good faith regarding his belated statement. Therefore, even if the Court construed Myers's traverse/sur-reply brief as containing a request for an extension of time to file his Local Rule 56.1 statement, the Court would deny it.

Second, putting aside Myers's failure to timely file a Local Rule 56.1, he generally fails to cite to evidence in the record in support of his factual assertions. Federal Rule of Civil Procedure 56 and Local Rule 56.1 require a summary judgment movement to reference or cite to the parts of the record supporting their factual assertions. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the . . . presence of a genuine dispute ...."); M.D. Pa. L.R. 56.1 (requiring that a summary judgment movant's statement of material facts "shall include references to the parts of the record

that support the statements"). Except in one instance in his brief in which Myers cites to a July 14, 2022 response to an Inmate's Request to Staff form, *see* (Doc. 61 at 2), his submissions do not contain citations to evidence in support of his factual assertions. *See* (Docs. 60 at 1–3; 61 at 1–2).[3] Moreover, even if Myers had timely filed his Local Rule 56.1 statement, it does not comply with the Local Rule insofar as he does not provide any citations to the record in support of the five factual references contained in his statement. *See* (Doc. 68 ¶¶ 1–5).[4]

As best the Court can discern, Myers principally relies on the allegations in his second amended complaint to support his factual assertions. *See* (Docs. 61 at 2 ("Myers filed civil [sic] action against Defendants . . . alleging undisputed facts of constitutional deprivations by each [D]efendant."); 60 ¶ 22 ("As [the Court] has issued an opinion stating that the Plaintiff has sufficiently pled a constitutional deprivation, no matters of material facts are in dispute and this case is ripe for [s]ummary [j]udgment.")). An initial issue with Myers's reliance on his second amended

---

[3] Myers includes some factual assertions within his motion for summary judgment, *see* (Doc. 60 at 1–3). Yet, there are no citations to the record in support of those factual assertions. *See* (*id.*).

[4] Myers's Rule 56.1 statement technically contains seven numbered paragraphs, *see* (*id.* at 1); however, his last two paragraphs consist of legal conclusions. *See* (*id.* ¶¶ 6–7).

complaint is that he still fails to comply with Rule 56 and Local Rule 56.1 by citing to the portions of his second amended complaint that support his factual assertions. Moreover, and perhaps more importantly, Myers cannot solely rely on his second amended complaint to support his summary judgment motion.

Although typically arising in the context of a plaintiff's response to a defendant's motion for summary judgment, *see, e.g.*, *Celotex Corp.*, 477 U.S. at 324 (explaining that once the summary judgment movant satisfies their burden to demonstrate the absence of a genuine dispute of material fact, the burden of production shifts to the nonmoving party, who must "go beyond the pleadings" with affidavits, "depositions, answers to interrogatories, and the like" to show specific material facts giving rise to a genuine dispute), a court may consider a plaintiff's ***verified*** complaint to the extent that it based on personal knowledge and asserts facts that would be admissible in evidence when ruling on a motion for summary judgment. *See McKay v. Krimmel*, No. 22-1302, 2023 WL 4231714, at *2 n.4 (3d Cir. June 28, 2023) (unpublished) ("A verified complaint may be treated as an affidavit with evidentiary value at the summary-judgment stage. However, it cannot create a genuine dispute of material fact if contradicted by the story told by discovery." (citations and internal quotation marks omitted)); *Revock v.*

*Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 100 n.1 (3d Cir. 2017) ("[W]e consider as affidavits Walters and Kromenhoek's sworn verified complaints, to the extent that they are based upon personal knowledge and set out facts that would be admissible in evidence."); see also Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Doe v. Heart Solution, PC*, 923 F.3d 308, 315 (3d Cir. 2019) ("[W]hile an unsworn statement may be considered on summary judgment, an unsworn statement that has not been made under penalty of perjury cannot."); *Paladino v. Newsome*, 885 F.3d 203, 209 (3d Cir. 2018) (explaining that "a single, non-conclusory affidavit . . . when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment" and that, "[t]his is true even where, as here, the information is self-serving" (citations and internal quotation marks omitted)). Presuming that a plaintiff's verified complaint is also sufficient to support their motion for summary judgment, Myers cannot rely on his second amended complaint because he did not sign it under penalty of perjury.

Under 28 U.S.C. §1746, if a matter is required to be "supported, evidenced, established, or proved" by a sworn written verification:

> such matter may, with like force and effect, be supported, evidenced, established, or proved by [an] unsworn . . . verification, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: . . . 'I declare (or certify, verify, or state***) under penalty of perjury*** that the foregoing is true and correct. Executed on (date). (Signature)'."

28 U.S.C. §1746 (emphasis added). Here, Myers's verification included with his second amended complaint states: "I, Geary Myers, do hereby verify under 28 U.S.C. §1746 that all contained herein is true and correct to my personal knowledge." (Doc. 22 at 6 (underlining in original)). As shown by this language, Myers's verification does not include a reference to perjury, and "[c]ourts have found similar language—i.e., language that is missing the reference to perjury—insufficient to satisfy the 'substantial compliance requirement of §1746." *Meronvil v. Doe*, No. 17-cv-8055, 2023 WL 4864383, at *1 n.2 (D.N.J. July 31, 2023) (citing cases); *see also Timmons v. Bohinski*, --- F.4th ---, 2026 WL 2331684, at *4 (3d Cir. Aug. 12, 2026) ("[A] non-movant's position is 'unsupported,' . . . where opposition to the summary judgment motion is limited to a declaration that is 'unsworn and not given under the penalty of perjury.'" (quoting *Lauria v. Lieb*, 152 F.4th 549, 552 (3d

Cir. 2025))). Therefore, Myers may not rely solely on his allegations in his second amended complaint when seeking summary judgment in this case.

It also appears that Myers believes that he can rely on the allegations in his second amended complaint because Defendants do not dispute or contest those allegations and because this Court determined that he sufficiently pleaded retaliation claims against Defendants when granting his motion for reconsideration. *See* (Docs. 61 at 2 (asserting that his factual allegations are "undisputed" and that "Defendants . . . did not contest any factual allegations made in [his] filing against them"); 60 ¶19 ("Based on the March 7, 2025 opinion . . ., there are no material factual disputes between the Plaintiffs [sic] allegations and the findings."); *id.* ¶22 ("As [the Court] has issued an opinion stating that the Plaintiff has sufficiently pled a constitutional deprivation, no matters of material facts are in dispute . . . ."). He is mistaken.

As for Defendants' conduct in this case, they have not failed to contest Myers's allegations in his second amended complaint. They filed an answer in which they deny most of his allegations and all his requests for relief, and they assert eight affirmative defenses to Myers's claims. *See* (Doc. 28 at 1–9). As for the Court's March 7, 2025 Memorandum and Order resolving Myers's motion for reconsideration (Docs. 53, 54), all that Myers can take away from that decision is the Court's finding that he asserted sufficient

allegations in his second amended complaint to allow his retaliation claims to proceed to discovery. In other words, the March 7, 2025 decision is not determinative as to whether any party is entitled to summary judgment in this case. Therefore, Myers is incorrect to the extent that he believes any actions by Defendants or this Court have resulted the Court treating his factual allegations in his second amended complaint as undisputed.

Third, and finally, even if the Court determined that Myers presented sufficient evidence regarding the prima facie elements of his First Amendment retaliation claims against Defendants, the Court would still deny his motion for summary judgment because Defendants have asserted affirmative defenses, including, *inter alia*, his alleged failure to exhaust his administrative remedies. *See* (Doc. 28 at 8–9). In addition, Myers ignores a specific part of his claims, namely, once he establishes a prima facie case of retaliation, the burden shifts to Defendants to show, by a preponderance of the evidence, that "they would have made the same decision" about his placement in AC and prison transfer "absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334. Myers does not address Defendants' same-decision defense in his summary judgment submissions, and he did not respond to Defendants'

discussion of this defense in their brief opposing his motion for summary judgment. *See* (Doc. 62 at 6–7).

Overall, in seeking summary judgment, Myers has not complied with the Federal and Local Rules, fails to identify and cite to evidence in the record demonstrating that there is no genuine issue of material fact on his retaliation claims, and ignores Defendants' affirmative defenses and their ability to assert the same decision defense even if he establishes a prima facie case of retaliation against Defendants. Accordingly, the Court will deny Myers's motion for summary judgment.

**B. Defendants' Motion for Summary Judgment**

Defendants also move for summary judgment on Myers's First Amendment retaliation claims against them. (Docs. 57–59). They argue that the Court should grant their motion and enter summary judgment in their favor because Myers (1) did not exhaust his administrative remedies on his claims, (2) fails to identify and produce competent evidence showing that they were aware of his protected activity and that they caused him to suffer an adverse action, and (3) cannot establish damages. *See* (Doc. 59 at 6–15, 17–18). Defendants also contend that the record shows that they would have made the same decisions regarding Myers's placement in AC and his prison transfer regardless of his protected conduct. *See* (*id.* at 15–16). The Court

will first discuss issues with Myers's submissions and then set forth the applicable factual record before addressing Defendants' arguments.

### 1. Myers's Submissions

There are two issues with Myers's submissions in response to Defendants' motion for summary judgment. The first issue is Myers's unauthorized filing of a sur-reply brief, which the Court previously briefly discussed. Because Myers did not seek and obtain approval from this Court to file his sur-reply brief, the Court will not consider it in resolving Defendants' motion for summary judgment. However, for sake of completeness, the Court will discuss certain aspects of Myers's traverse/sur-reply brief while addressing Defendants' motion.

The second issue with Myers's submissions is his failure to file a response to Defendants' Local Rule 56.1 statement. In accordance with Local Rule 56.1, Defendants filed a statement of material facts in support of their motion for summary judgment. *See* (Doc. 58); M.D. Pa. L.R. 56.1 ("A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."). Myers did not file a counter statement of material facts, responding to the numbered paragraphs set forth in

Defendants' statement, as required by Local Rule 56.1. *See id.* ("The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the [moving party's statement], as to which it is contended that there exists a genuine issue to be tried."). Myers's failure to file a counter statement is not excused simply because he is proceeding *pro se* as the Local Rules and Federal Rules of Civil Procedure apply with equal force to all parties. *See Mala*, 704 F.3d at 245 (explaining that *pro se* parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

Due to Myers's failure to file a counter statement, Defendants' material facts identified in their statement are deemed admitted because:

> A failure to file a counter-statement equates to an admission of all the facts set forth in the movant's statement. [Local Rule 56.1] serves several purposes. First, it is designed to aid the Court in its determination of whether any genuine issue of material fact is in dispute. Second, it affixes the burden imposed by Federal Rule of Civil Procedure 56(e), as recognized by *Celotex Corp. v. Catrett*, on the nonmoving party "to go beyond the pleadings and by [their] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, *designate specific facts showing that there is a genuine issue for trial*." 477 U.S. 317, 324 (1986) (internal quotation marks omitted) (emphasis added).

*Doe v. Winter*, No. 04-cv-2170, 2007 WL 1074206, at *1 n.2 (M.D. Pa. Apr. 5, 2007).

The Court notes that Myers, in his unauthorized sur-reply brief, argues that the Court should not deem admitted Defendants' factual averments in their Local Rule 56.1 statement apparently because of his belated submission of his own statement of facts. *See* (Doc. 69 at 2 ("Based on these facts, the Defendant's [sic] averment that all of the material facts that they set forth in their statement of [m]aterial [f]acts should not be accepted as admitted, and the defendant's [sic] request that all defenss [sic] have been waived should be denied."). If the Court considered Myers's argument, the Court would still deem admitted Defendants' factual averments in their statement because he did not comply with Local Rule 56.1 insofar as his belated statement of facts does not "respond[] to the [thirty-eight] numbered paragraphs set forth" in Defendants' statement. M.D. Pa. L.R. 56.1. Instead, Myers sets forth seven numbered paragraphs in his untimely Local Rule 56.1 statement, none of which reference Defendants' averments in their Local Rule 56.1 statement. *See* (Doc. 68 at 1). Myers also drafted this submission in a manner indicating that he meant it to support his motion for summary judgment and not as a response to Defendants' statement of facts. *See* (*id.* (stating that he "submits the following statement of material facts in support of summary judgment," arguing that "[b]ased on these facts, summary judgment is required in this case," and requesting that the Court "grant his

request for [s]ummary [j]udgment”). Therefore, Myers’s belated Local Rule 56.1 statement has no bearing on Defendants’ motion for summary judgment and does not alter the Court’s decision to deem admitted Defendants’ factual averments in their Local Rule 56.1 statement due to his failure to file a proper response to this statement.

### 2. Factual Record

#### a. Relevant DOC Policies

##### i. DC-ADM 802

DC-ADM 802 is the DOC’s policy relating to AC placements. *See* (Doc. 58-8 at 2 (indicating that the DOC has implemented a policy by which it may “place an inmate in Administrative Custody (AC) status” if the inmate’s “presence in general population would constitute a threat to life, property, himself/herself, staff, other inmates, the public, or the secure or orderly running of the facility”)). DC-ADM 802 provides in pertinent part that “[a] general population inmate may be assigned AC status . . . by order of the Shift Commander” if, *inter alia*, “the inmate is in danger from some person(s) in the facility and cannot be protected by alternate measures, and/or the inmate is a danger to some person(s) in the facility and the person(s) cannot be protected by alternative measures . . . .” (*Id.* at 9.) In addition, an inmate may be placed in AC if “the inmate has been charged with, or is under

investigation for a violation of facility rules, and there is a need for increased control pending disposition of charges or completion of the investigation." (*Id.* at 10.)

Following an inmate's placement in AC, the correctional facility's Program Review Committee ("PRC") must conduct an administrative hearing during which, *inter alia*, the reasons for placement in AC are explained to the inmate. *See* (*id.* at 13). Following completion of the hearing, the inmate has two "work days" to "appeal the decision of the PRC concerning [their] initial confinement in AC" to the Facility Manager/designee. (*Id.* at 15; Doc. 58 ¶29.) The inmate must submit any appeal in writing. *See* (Doc. 58-8 at 15).

If an inmate appeals from the PRC's decision to place them in AC, the Facility Manager/designee has ten days to decide the appeal and forward the decision to the inmate. *See* (*id.*). If the inmate is dissatisfied with the Facility Manager/designee's decision, they have seven days to file an appeal to the Office of the Chief Hearing Examiner. *See* (*id.*; Doc. 58 ¶30). The Officer of the Chief Hearing Examiner must resolve the appeal within two work days after receiving it. *See* (Doc. 58-8 at 15).

DC-ADM 802 also directs that all issues concerning the reason for an inmate's placement in AC or the duration of their custody must be addressed through the procedures set forth in DC-ADM 802, and specifically excludes

relief through the Inmate Discipline Policy, DC-ADM 801, and the Inmate Grievance Policy, DC-ADM 804. *See* (*id.* at 17). In this regard, DC-ADM 802 sets forth the following requirements:

> All issues concerning the reason for an inmate's placement in AC custody or the duration of his/her AC custody must be addressed through the procedures set forth in this procedures manual and may not be addressed through the procedures set forth in Department policies DC-ADM 801, "Inmate Discipline" or DC-ADM 804, "Inmate Grievance System." An inmate is required to raise any issue concerning the reason for or the duration of his/her AC custody during the regularly scheduled PRC review. The PRC's decision may be appealed through the procedures set forth in Subsection C. above. Issues concerning the failure of the PRC to conduct a timely initial AC placement hearing or a regularly scheduled review may be appealed to the Facility Manager and then to the Chief Hearing Examiner under the procedures set forth in Subsection C. above. The granting or denial of privileges may not be appealed.
>
> . . . Conditions or other circumstances of the inmate's AC status, other than reason or duration, must be addressed through the grievance process set forth in Department policy DC-ADM 804.

(*Id.* (emphasis omitted)).

**ii. DC-ADM 804**

The DOC has adopted an Inmate Grievance Policy, DC-ADM 804. *See* (Docs. 58 ¶34; 58-12). Under DC-ADM 804, the DOC requires every inmate in its custody to "have access to a formal procedure" through which they can "seek resolution of problems or other issues of concern arising during the course of [their] confinement." (*Id.* at 2.) The DOC refers to its "formal

procedure" as the "Inmate Grievance System," (*id.*), and it is comprised of three separate steps. *See* (*id.* at 5–26). The first step requires the inmate to submit a written grievance to the Facility Grievance Coordinator or designee, usually the Superintendent's Assistant, within fifteen working days after the event upon which the grievance is based. *See* (*id.* at 6). For the second step, the inmate must appeal an initial review response/rejection to the Facility Manager or designee within fifteen working days from the date of the initial review response/rejection. *See* (*id.* at 16). For the third step, if the inmate "is dissatisfied with the disposition of an appeal from the Facility Manager/designee," they must "submit an Inmate Appeal to Final Review" to the DOC Secretary's Office of Inmate Grievances and Appeals ("SOIGA") within fifteen working days of the date of the Facility Manager/designee's decision. *See* (*id.* at 19).

DC-ADM 804 also contains the following provision relating to the types of issues and claims that an inmate may not grieve via the Inmate Grievance Policy:

> Issues concerning a specific inmate misconduct charge, conduct of hearing, statements written within a misconduct and/or other report, a specific disciplinary sanction, and/or the reasons for placement in administrative custody will not be addressed through the Inmate Grievance System and must be addressed through Department policy DC-ADM 801, "Inmate Discipline" and/or DC-ADM 802, "Administrative Custody Procedures."

> Issues other than specified above must be addressed through the Inmate Grievance System.

(*Id.* at 6.)

**b. Myers's Placements in AC**

On or around June 17, 2021, prison officials received an anonymous request slip stating that Myers was "threatening and extorting inmates on H-Block." (Docs. 58 ¶19; 58-2 at 2.) On June 17, 2021, Myers was notified that he was being placed in AC. *See* (Docs. 58 ¶31; 58-9 at 2). The notice indicated that Myers was placed in AC because he was "charged with, or [was] under investigation for[,] a violation of facility rules and there [was] a need for increased control pending disposition of charges or completion of the investigation." (Docs. 58 ¶31; 58-9 at 2); *see also* (Doc. 58-2 ("On 6/17/2021, . . . Myers was confined to the Restricted Housing Unit [("RHU")] . . . for investigation . . . ."). The notice also indicated that Myers's AC placement was "for non-disciplinary reasons." (Doc. 58-9 at 2.)

On June 29, 2021, Myers was interviewed as part of the security office's investigation. *See* (Docs. 58 ¶20; 58-2 at 2). Following this interview, the Security Office, apparently via Monko, a DOC Lieutenant responsible for security investigations at SCI Dallas, recommended that Myers be released to general population but on a different cell block. *See* (Docs. 22 ¶2; 28 ¶2; 58 ¶21; 58-2 at 3). On June 30, 2021, the PRC, which included Bohinski, the

Deputy for Centralized Services at SCI Dallas, and Belles, a DOC Lieutenant, released Myers to general population and directed that he be housed in a different cell block. *See* (Docs. 22 ¶¶1, 3; 28 ¶¶1, 3; 58 ¶22; 58-3 at 2).

On July 6, 2021, Myers was placed in AC (in the RHU) "due to information received that he was going to assault an officer," which was noted as Myers's "second confinement due to possible threats he made to cause harm to others in the institution." (Docs. 58 ¶23; 58-4 at 2.) On the same date, Myers received a notice that he was being placed in AC because he was again "charged with, or [was] under investigation for[,] a violation of facility rules and there [was] a need for increased control pending disposition of charges or completion of the investigation." (Docs. 58 ¶32; 58-10 at 2.) As with his prior notice, this notice stated that Myers's AC placement was "for non-disciplinary reasons." (Doc. 58-10 at 2.) It also contains a handwritten statement that Myers was "[p]laced in L-5 until cleared by [the] Security Office." (*Id.*)

The Security Office interviewed Myers on July 13, 2021. *See* (Docs. 58 ¶24; 58-4 at 3). Approximately a week later, on July 19, 2021, Monko recommended that Myers "be held [in] AC status in the [RHU] until transferred to an institution that meets his correctional needs" because (1)

"[t]he Security Office deem[ed him] a security threat to SCI[]Dallas due to information received that he may be a danger to others in the institution" and (2) "the Security Office cannot guarantee the safety of staff and/or inmates if he is released back to general population at SCI[]Dallas." (Docs. 58 ¶25; 58-4 at 3.)

On July 20, 2021, a vote sheet was created for Myers to be separated from SCI Dallas based on his threat to assault a corrections officer "[t]o ensure the safety and security of the institution." (Docs. 58 ¶26; 58-5 at 2). The following day, the PRC, which again included Bohinski and Belles, reviewed Myers's AC status and continued that status "pending transfer." (Docs. 58 ¶27; 58-6 at 2.)

Myers never filed an appeal from either AC placement to the Chief Hearing Examiner's Office. *See* (Docs. 58 ¶33; 58-11 ¶6).

### c. Myers's Use of the Grievance Process

Between June 4, 2021, and September 23, 2021, Myers appears to have filed two grievances: Nos. 947043 and 947059. *See* (Docs. 58 ¶¶35–36; 58-13 at 2). Grievance No. 947043 pertained to "property," was initially rejected, and Myers did not appeal from the rejection. *See* (Docs. 58 ¶37; 58-13 at 2). Grievance No. 947059 related to "A/C Procedures," also was

initially rejected, and Myers did not appeal from the rejection. *See* (Docs. 58 ¶37; 58-13 at 2).

On October 28, 2021, Myers filed a grievance (No. 955065) pertaining to his placement in AC and prison transfer. *See* (Doc. 58-7 at 2). In this grievance, Myers stated as follows:

> On 10-20-21, I was informed that Security Lt. Monko, Major Goynes, Deputy Bohinski[,] and the [SCI] Dallas Security/Administration Staff took part in falsifying public documents, defamed my character and deliberately sabotaged my commutation process by placing me in the RHU under false pretenses and lying on a transfer petition when they stated that I was being transferred for an attempted assault on a [c]orrectional [o]fficer with a weapon involved on August 6, 2021. This accusation is blatantly false[,] and I was in the RHU [AC s]tatus for more than four months because of this false accusation. I was present for every PRC [r]eview during this time and these false accusations were never addressed nor mentioned. I met with Security Lt. Monko on two occasions and these fal[s]e allegations were never mentioned. I am asking that[:] 1. These false allegations be permanently removed from my file/record. 2. That I be transferred back to my home region. 3. That I be paid $1,000.00 a day for every[]day that I was housed in the RHU under inhumane conditions and false allegations. 5. [sic] Any other sanctions/penalties that the court may deem appropriate.

(*Id.*). In submitting this grievance, Myers did not identify any “actions taken and staff [he] ha[d] contacted[] before submitting [the] grievance.” (*Id.*)

After an extension, Myers received an Initial Review Response dated December 17, 2021 from a Security Captain at SCI Greene. *See* (*id.* at 5).

The Initial Review Response denied Myers's grievance and identified the reasons for the denial as follows:

> You claim that SCI Dallas Administration falsified documents, defamed your character[,] and deliberately sabotaged your commutation process by placing you in the RHU and by lying on a transfer petition. As you are aware[,] you were placed into the RHU because information was received that you were attempting to obtain a weapon to assault a staff member and that you were also planning to assault other inmates as well. This was explained to you when you were interviewed by Lt. Monko[,] and it was also explained to you that due to these allegations and for the safety of both staff and inmates alike[,] that you were going to remain in the RHU until you could be separated from SCI Dallas. As far as your claim that the [PRC] never addressed or mentioned these allegations, this is false, a review of your PRC notes revealed that PRC regularly met with you and discussed the investigation and separation process and were available to you.

(*Id.*)

Myers appealed from the denial of his grievance by filing an Appeal to Facility Manager dated January 6, 2022. *See* (*id.* at 6). Myers set forth the following grounds for his appeal:

> This is an appeal of the denial of Grievance #955065. This Grievance should not have been denied and all facts stated within it should have been taken as facts. I was never given notice as to why I was placed in the RHU by Lt. Monko or PRC. The information that was supported to have bee [sic] received is false and was never addressed by either Lt. Monko or during nay of my PRC meetings as claimed in the denial of this grievance. I was never givent [sic] he [sic] opportunity to defend myself against these or any other allegations. To placed [sic] these unfounded accusations on my permanent record and a transfer petition without properly investigating them is not only a

> defemation [sic] of my character, it sabotages my commutation process. I ask that you look into this foul practice being implemented by your staff and remand this grievance back to the initial review process so that this eggregious [sic] mishap can be rectified. I was placed in the RHU on June 17, 2021[,] and placed under investigation by Lt. Monko and released back into general population on June 30, 2021[,] after Lt. Monko spoke to me and determined that he did not believe that I was a threat to anyone after he said only that "someone put a slip in on me[."] I also signed a statement, stating that I had no issues with anyone and that I am focused on my commutation process and legal work.

(*Id.*)

K. Ransom ("Ransom"), SCI Greene's Facility Manager, after an extension, issued a Facility Manager Appeal Response dated February 23, 2022. *See* (*id.* at 8–9). Ransom upheld the Initial Review Response, explaining as follows:

> I have reviewed the above-noted grievance, the Grievance Officer's response[,] and your subsequent appeal of said grievance. My decision is as follows:
>
> Captain Brozowski was assigned as the grievance officer and has adequately addressed your concerns regarding your allegations that SCI Dallas falsified documents, defamed your character and deliberately sabotaged your commutation process by placing you in the RHU and lying on your transfer petition.
>
> It is notable that the reasons for placement in [AC] will not be addressed through the Inmate Grievance System. During an interview with Captain Brozowski and Lt. Monko it has been determined that a truthful investigation was conducted. As stated in the [Initial Review Response], during your interview, Lt. Monko explained to you the reason for your stay in the RHU as well as the transfer. In reference to you not given [sic] an opportunity to defend yourself against the accusations; no misconduct was

> issued, there was no reason for you to defend yourself. Again, reasons for [AC] status of confinement is for non-disciplinary reasons that provides [sic] closer supervision, control, and protection than provided in [general population]. Your request for remand is denied. Based on the aforementioned, I uphold the response.

(*Id.* at 9.)

After Ransom upheld the denial of Myers's grievance, Myers filed a final appeal to SOIGA. *See* (*Id.* at 10); *see also* (Docs. 22 at 1; 28 at 2).[5] SOIGA upheld the denial of Myers's grievance, explaining as follows:

> You claim in your grievance that administrative staff falsified documents, defamed your character[,] and deliberately sabotaged your commutation process by placing you in the RHU. You claim they lied on a transfer petition. An investigation was conducted regarding your allegations. The record reflects that you were placed in the RHU because information was received that you were attempting to obtain a weapon to assault a staff member and that you were also planning to assault other inmates as well. The record reflects that this was discussed with you during your interview with Lt. Monko. The record reflects that a separation was filed and you were transferred to SCI Greene. The record reflects that this was also discussed with you during your PRC reviews. You have failed to provide any evidence that staff falsified documents. Therefore, your grievance is denied as well as your requested relief.

(Doc. 58-7 at 10.)

[5] Defendants did not attach a copy of Myers's appeal to SOIGA to their statement of material facts.

### 3. Analysis

As indicated above, Defendants raise several arguments in support of their summary judgment motion. However, the Court will address only one of those arguments—Myers's failure to exhaust his administrative remedies—in this Memorandum because it is dispositive in this case.

Regarding Myers's placement in AC, the summary judgment record unequivocally shows that he never filed an appeal from the PRC's decision to place him in AC status on July 6, 2021, as provided for under DC-ADM 802.[6] Myers appears to argue that he had no reason to file an appeal

[6] In his unauthorized sur-reply brief, Myers argues that he exhausted his AC placement claim by filing a grievance that was rejected due to the issue not being grievable, and he was unable to appeal the rejection because the DOC does not permit appeals from rejected grievances, "especially if the rejection is based on a determination that the complaint is not cognizable under the grievance system." (Doc. 69 at 4.) Myers also contends that Defendants waived an exhaustion defense by "fail[ing] to include any argument . . . concerning exhaustion of administrative remedies" in their Local Rule 56.1 statement. (*Id.*) If the Court considered these arguments, the Court would reject them as frivolous and meritless.

As for Myers's latter contention, Defendants identify facts pertaining to their exhaustion defense in their Local Rule 56.1 statement and include argument about exhaustion in their summary judgment brief. *See* (Docs. 58 at 7–8; 59 at 6–10). Concerning Myers's former argument, he misstates the DOC's grievance policy relating to rejected grievances, because DC-ADM 804 clearly states that an inmate may appeal from a rejected grievance. *See* (Doc. 58-12 at 21 ("An inmate may appeal the rejected grievance to the Facility Manager in accordance with Section 2 of this procedures manual." (emphasis omitted)). Therefore, Myers needed to file an appeal from the

*(footnote continued on next page)*

because Bohinski falsely informed him that he was in danger, and, upon learning about the "false accusations made against him" on or about October 19, 2021, he filed Grievance No. 955065 on October 29, 2021. *See* (Doc. 65 ¶¶2, 7). Although Myers does not cite to any evidence in the record in support of these factual assertions, *see* (*id.*), even if such supporting evidence existed, it would not show that he exhausted his administrative remedies concerning his retaliation claims because, as Defendants point out in their supporting brief, Myers never claims in Grievance No. 955065 that the actions complained of "were taken in retaliation for [his] complaints regarding Belles and Monko." (Doc. 59 at 10). Thus, Myers's Grievance No. 955065 suffers from a fundamental defect, namely, his failure to notify prison officials that he was asserting retaliation claims against Defendants.

PLRA exhaustion "requires 'inmates [to] provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures.'" *Mack v. Warden Loretto FCI*, 839 F.3d 286, 296 (3d Cir. 2016) (alteration in original) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)). "Restated slightly, an inmate's grievance

---

rejection of his grievance (presumably No. 947059) if he sought to fully exhaust his claim as to the contents in that grievance. Furthermore, to properly exhaust any claim pertaining to his AC placement, he was required to follow the procedures set forth in DC-ADM 802, which he did not do in this case.

must include facts sufficient to place prison officials on notice of the claim or claims to be investigated." *Jackson v. O'Brien*, No. 18-cv-32, 2021 WL 5087922, at *6 (W.D. Pa. Nov. 2, 2021). This requirement is reflected by the language in DC-ADM 804, which requires an inmate to "specifically state any claims [they] wish[] to make concerning violations of Department directives, regulations, court orders, or other law." (Doc. 58-12 at 6).

Here, Myers complains in Grievance No. 955065 about Monko, Bohinski, former Defendant Major Goynes, and SCI Dallas "Security/Administration Staff" "falsifying public documents, defam[ing] his character[,] and deliberately sabotag[ing his] commutation process." (Doc. 58-7 at 2). He claims that they "placed [him] in the RHU under false pretenses" and lied in his "transfer petition" by "stating that [he] was being transferred for an attempted assault on a [c]orrectional [o]fficer with a weapon . . . on August 6, 2021." (*Id.*) He also mentions that he remained in AC status in the RHU under unspecified "inhumane conditions" for "more than four months because of this false accusation." (*Id.*) There is neither an explicit reference to retaliation in Grievance No. 955065 nor any facts that would place the reviewing officials on notice that Myers believed that the events surrounding his AC placement or prison transfer were due to retaliation, much less Defendants' retaliation.

The Court recognizes that even though it is unnecessary for a plaintiff to "use the word 'retaliation' in [their] grievance to properly raise the claim, [they still] must include enough information to put prison officials on notice that the substance of the issue is retaliation." *Jackson*, 2021 WL 5087922, at *6. In this case, Grievance No. 955065 alerted prison officials that Myers believed that false information about an attempted assault on a correctional officer caused his placement in AC and was included in his transfer petition, and it possibly alerted them to his belief that he was confined under "inhumane conditions" while in the RHU; however, it did not notify them about any possible retaliation. *See, e.g.*, *Vo v. Wetzel*, No. 22-1210, 2022 WL 1467978, at *2 (3d Cir. May 10, 2022) (unpublished) (concluding that the district court "properly found that [the prisoner-plaintiff] failed to exhaust her equal protection claim for the confiscation of her art portfolio" because even though the plaintiff's "grievance informed prison officials that her property had been confiscated in contravention of the prison's policies, . . . it did not alert them to any issue of disparate treatment"). In the end, since Grievance No. 955065 did not alert prison officials or otherwise place them on fair notice that Myers was asserting retaliation claims against Defendants, it did not "initiate or exhaust [Myers's] administrative remedies as to th[ose] claim[s]." *Jackson*, 2021 WL 5087922, at *6; *see also Brown v. U.S. Just. Dep't*, 271

F. App'x 142, 145–46 (3d Cir. 2008) (unpublished) (agreeing with district court that prisoner-plaintiff's grievance "did not put Defendants on notice of a retaliatory transfer claim"); *Quinn v. Palakovich*, 204 F. App'x 116, 118 (3d Cir. 2006) (unpublished) (determining that prisoner-plaintiff's failure-to-protect claim against correctional officials was not exhausted where the plaintiff's grievance included "brief language about [his] slip-and-fall in the kitchen," which "serves only to describe the location of his injury to the personnel receiving his grievance about his medical treatment"); *Jackson v. Mason*, No. 22-cv-845, 2025 WL 2809344, at *17–18 (M.D. Pa. Sept. 30, 2025) (determining that *pro se* prisoner-plaintiff failed to exhaust First Amendment retaliation claims because his grievance "fail[ed] to provide prison officials with notice that [he] was asserting a retaliation claim against any Defendant" (footnote omitted)); *Pew v. Little*, No. 22-cv-1488, 2025 WL 2471780, at *4 (E.D. Pa. Aug. 27, 2025) ("While Pew's grievance alerted prison officials to his primary concern—that he had been denied an electric razor—Pew's grievance makes no reference to discrimination vis-à-vis other inmates."); *Simmons v. Gilmore*, No. 17-cv-00996, 2021 WL 1215773, at *11 (W.D. Pa. Mar. 31, 2021) (granting summary judgment in favor of defendant prison officials on prisoner-plaintiff's First Amendment retaliation claim for failure to exhaust where plaintiff's grievance "did not reasonably identify the

factual basis for, or otherwise put prison officials on notice of, a First Amendment retaliation claim"). Accordingly, because there is no genuine issue of material fact as to whether Myers failed to exhaust his First Amendment retaliation claims against Defendants, the Court will grant their motion for summary judgment due to Myers's failure to exhaust.[7]

## IV. CONCLUSION

For the reasons stated above, the Court will deny Myers's motion for summary judgment and grant Defendants' motion for summary judgment. An appropriate Order follows.

s/ Malachy E. Mannion
**MALACHY E. MANNION**
**United States District Judge**

**DATE: September 28, 2026**
22-0402-03

[7] As explained supra, an inmate can demonstrate that a procedural default resulting from their failure to specifically assert a claim in their initial grievance should be excused if they show that the DOC considered such a claim on appeal and denied it on its merits. *See Bailey v. Yoder*, No. 20-cv-1836, 2023 WL 7329526, at *3 (M.D. Pa. Nov. 7, 2023). However, Myers not only has not asserted such an argument in this case, he also cannot make such a showing because the other documents in the record relating to Grievance No. 955065 demonstrate that prison officials did not consider him to have asserted retaliation claims. *See* (Doc. 58-7 at 3–10).